UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 10-50044-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| CRUZ HERNAN PORRAS-PALMA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**INTRODUCTION**

Defendant Cruz Hernan Porras-Palma is before the court on an

indictment charging him with possession of a fraudulent immigration

document in violation of 18 U.S.C. § 1546(a).  Mr. Porras-Palma has filed a

motion to suppress evidence obtained by police at a traffic stop in which he

was involved.  The government resists the motion.  The district court, the

Honorable Jeffrey L. Viken, referred this motion to this magistrate judge for a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the

court's standing order dated April 6, 2010.

**FACTS**

An evidentiary hearing on this motion was held on May 20, 2010, at

which Mr. Porras-Palma and his counsel, Monica Colbath were present.  The

government was represented at the hearing by its Assistant United States

Attorney Jeremy Jehangiri.  At the hearing, two witnesses testified: Fred

Koester, Sheriff of Jones County, South Dakota; and Lyle Brabazon, of the

United States Immigration and Customs Enforcement ("ICE") agency.  From

that testimony and the exhibits introduced at the hearing, the court makes the

following findings of fact.

On March 16, 2010, the roads were icy, although the weather was clear

and sunny.  Temperatures that day were cold.  Dispatch for Jones County had

called Sheriff Koester with several reports of accidents.  One such report was of

a pick-up truck which had rolled over in the median on Interstate 90 three

miles east of Murdo, South Dakota.  Dispatch reported that there were two

occupants of this vehicle.

Sheriff Koester reported to the location of the pick-up along with a tow

truck driver and observed both occupants of the pick-up outside the vehicle.

The pick-up had apparently been traveling at great speed as Sheriff Koester

observed that it had rolled over twice and traveled a significant distance

through deep snow in the median.  The driver of the pick-up, Mr. Porras-

Palma, was speaking on a cell phone at the time Sheriff Koester arrived at the

scene.

Both occupants of the pick-up appeared to be unhurt.  Sheriff Koester

noted that neither occupant would make eye contact with him.  This raised

nonspecific suspicions in Sheriff Koester's mind.  He testified that sometimes

people are nervous around law enforcement because they just do not like law enforcement, but that sometimes their nervousness is because they have something to hide.

After ascertaining that the occupants of the pick-up were not hurt and that their vehicle was capable of being driven for a short distance, Sheriff Koester directed Mr. Porras-Palma to drive to a truck stop at Murdo and pull into the parking lot of that place of business to wait for him. Sheriff Koester had received a report of a second accident a short distance away and had not yet checked on that accident. Thus, he wanted to go to the second accident location and investigate before taking the time to complete an accident report on the Porras-Palma accident.

Sheriff Koester testified that the pick-up Mr. Porras-Palma had been driving was unsafe to travel on the highway for any significant distance, but that it was driveable. He chose not to have the pick-up towed because that would have entailed a delay of approximately 30 minutes and he wanted to travel to the scene of the second accident with all due speed. Mr. Porras-Palma got behind of the wheel of the pick-up and his passenger entered the pick-up also. Mr. Porras-Palma drove to the truck stop indicated by Sheriff Koester and pulled into the parking lot to wait. Sheriff Koester followed Mr. Porras-Palma for safety reasons and ensured that he made it into the parking lot safely before proceeding on to the scene of the second accident.

There was a lapse of approximately 20 minutes between the time Mr. Porras-Palma entered the truck stop parking lot and the time Sheriff Koester returned to that location to write up a report of the accident. During that time, Mr. Porras-Palma and his passenger were free to move about. No law enforcement officer or any other person restricted their freedom of movement in any way.

When Sheriff Koester returned to the truck stop parking lot, Mr. Porras-Palma was again on his cell phone. Sheriff Koester asked him to end his phone call so that he could visit with Mr. Porras-Palma to get the information necessary to complete his accident report.

Sheriff Koester then asked Mr. Porras-Palma for his driver's license, vehicle registration, and proof of insurance on the pick-up. Sheriff Koester took a seat behind the wheel of his patrol vehicle and indicated that Mr. Porras-Palma should sit in the front passenger seat of the patrol vehicle. Mr. Porras-Palma sat where Sheriff Koester had indicated. The door to the patrol vehicle was probably closed, but it was unlocked at all times.

Mr. Porras-Palma, who Sheriff Koester testified appeared to understand English well and spoke to Sheriff Koester ably in English, then produced a vehicle registration, showing that the pick-up was registered to a business in New Jersey, along with proof of insurance. However, instead of producing a driver's license, Mr. Porras-Palma gave Sheriff Koester a Mexican identification

card for use by Mexican nationals while they are abroad.  See Exhibit Nos. 4 and 5.  Sheriff Koester again asked Mr. Porras-Palma for a driver's license. Mr. Porras-Palma told Sheriff Koester that he did not have a driver's license. Sheriff Koester than asked Mr. Porras-Palma if he had any other form of identification, to which Mr. Porras-Palma replied that he did not.

Sheriff Koester asked Mr. Porras-Palma how the accident had happened. Mr. Porras-Palma explained that he had just been driving along when he lost control of the pick-up on ice and rolled.  At this point, Sheriff Koester testified that he believed Mr. Porras-Palma had committed at least two crimes: overdriving road conditions and driving without a valid driver's license.  At this point, Sheriff Koester testified that he could have placed Mr. Porras-Palma under arrest, but chose not to do so.  Sheriff Koester testified that he typically would not take a defendant into custody for either offense.

After Mr. Porras-Palma was unable to produce a valid driver's license or other identification, Sheriff Koester asked him if he was in the United States legally.  Mr. Porras-Palma replied in the negative.  Sheriff Koester then inquired whether the passenger was in the United States legally, and again, Mr. Porras-Palma replied in the negative.  Sheriff Koester left the patrol vehicle at this point and approached the passenger, asking for his identification.[1]  The

---

[1]Sheriff Koester testified that the passenger spoke little English and that Mr. Porras-Palma interpreted for Sheriff Koester when Koester spoke to the passenger.

passenger provided a Mexican identification card similar to the one Mr. Porras-Palma had provided.  At the point in his interaction with Mr. Porras-Palma when Sheriff Koester inquired about his legal status in the United States, Sheriff Koester testified that he was not yet finished with his accident investigation because he had not yet been shown a valid driver's license. However, his initial written report on this matter indicates that he asked the question after he was finished with his investigation of the accident.

At this point, Sheriff Koester told Mr. Porras-Palma and the passenger that he would have to take them back to his office to make some phone calls. Sheriff Koester transported the two to his office.  Mr. Porras-Palma rode in the front passenger seat next to Sheriff Koester and the passenger rode in the back seat.  Neither man was restrained by handcuffs or any other device.  Sheriff Koester never told either man that they were being placed under arrest.

Once at the Sheriff's Office, Koester called the ICE office.  The agent in the ICE office asked Sheriff Koester to fax him a copy of both men's identification cards, which Sheriff Koester then did.  After receiving the fax, ICE called Sheriff Koester back and advised him that ICE was placing a detainer on both men.  Sheriff Koester accordingly held both men until an ICE agent came to Murdo to retrieve them.

Sheriff Koester impounded the pick-up Mr. Porras-Palma had been driving at the time of the accident.  Prior to impounding the vehicle, Sheriff

Koester performed an inventory search of the vehicle to document the contents of the vehicle and protect himself against later claims of theft. Some evidence pertinent to the current charges was discovered in that inventory search. Sheriff Koester testified that an inventory search would not typically be done in cases of a driver's license violation or overdriving road conditions.

Lyle Brabazon from the ICE office testified that he received a call and a fax from Sheriff Koester on March 16, 2010. He testified that he ran Mr. Porras-Palma's identification card through nine different data bases. He discovered that Mr. Porras-Palma had twice in the past been apprehended for being in the United States illegally and that he had twice been voluntarily removed back to Mexico. Agent Brabazon testified that the data bases did not show any indication that Mr. Porras-Palma had re-entered the United States legally after either of the prior deportations. He therefore called Sheriff Koester and lodged a detainer against Mr. Porras-Palma on behalf of ICE. Agent Brabazon testified that ICE would not have taken possession of the pick-up nor would ICE have conducted an inventory search of the pick-up as part of its assertion of a detainer against Mr. Porras-Palma.

At no time did Sheriff Koester arrest Mr. Porras-Palma. At no time did Sheriff Koester advise Mr. Porras-Palma of his Miranda rights. Sheriff Koester testified that Mr. Porras-Palma was not free to leave from the time Sheriff Koester made initial contact with him up until the time ICE retrieved him.

Sheriff Koester testified that, after Mr. Porras-Palma said that neither he nor his passenger were in the United States legally, he made no further statements on the way to the Sheriff's office or thereafter.

Mr. Porras-Palma now makes two arguments in support of the suppression of his statements to Sheriff Koester and the evidence seized from the pick-up. First, he argues that the evidence should be suppressed because Sheriff Koester never advised him of his <u>Miranda</u> rights. Second, he argues that evidence should be suppressed because Sheriff Koester illegally detained him beyond what was necessary to investigate the accident. The government resists both arguments.

## DISCUSSION

## A. Suppression Based on Failure to Advise of <u>Miranda</u> Rights

### 1. Whether Mr. Porras-Palma Was In Custody

Mr. Porras-Palma argues that he was "in custody" on March 16, 2010, necessitating the advisement of his <u>Miranda</u> rights. Since Sherrif Koester did not advise Mr. Porras-Palma of his <u>Miranda</u> rights on this date, Mr. Porras-Palma argues that his statements at the traffic stop and the evidence obtained from his vehicle should be suppressed.

The holding of the <u>Miranda</u> case "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990)

(citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  Miranda warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may choose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time."  Colorado v. Spring, 479 U.S. 564,  574 (1987).  A Miranda warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  Unites States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Here, neither party disputes that Mr. Porras-Palma was being interrogated on March 16, 2010, and neither disputes that he was not advised of his Miranda rights.  Therefore, whether the evidence derived from the traffic stop should be suppressed hinges on whether Mr. Porras-Palma was in custody at that time, thereby requiring the administering of Miranda warnings.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  See United States v. Charbonneau, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in

9

custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden.  <u>See</u> <u>United States v. Moore</u>, 104 F.3d 377, 391 (D.C. Cir. 1997).  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  <u>See e.g.</u> <u>United States v. Morriss</u>, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Porras-Palma was *not* in custody on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way."  <u>Griffin</u>, 922 F.2d at 1347 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 (1984)).  Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  <u>Berkemer</u>, 468 U.S. at 442; <u>United States v. Black Bear</u>, 422 F.3d 658, 661 (8th Cir. 2005); <u>Griffin</u>, 922 F.2d at 1347; <u>Carter</u>, 884 F.2d at 370.  The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  <u>Berkemer</u>, 468 U.S. at 442; <u>Black Bear</u>, 422 F.3d at 661; <u>Griffin</u>, 922 F.2d at 1347; <u>Carter</u>, 884 F.2d at 370.  In determining

whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances.  <u>Carter</u>, 884 F.2d at 370 (citing <u>United States v. Lanier</u>, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

The Supreme Court in <u>Berkemer</u> addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of <u>Miranda</u>.  After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that <u>Miranda</u> warnings are required.  <u>Berkemer</u>, 468 U.S. at 434-35.

However, during the traffic stop itself and prior to arrest, the Court held that <u>Miranda</u> did not apply.  <u>Id.</u> at 440-41.  The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away, once stopped. <u>Id.</u> at 436.

However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in <u>Miranda</u>.  <u>Id.</u> at 436-38.  For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation.  <u>Id.</u> at 437.  Also, the interrogation takes place in public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use

illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438.  Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." Id. at 440.

The Eighth Circuit recently discussed the application of Berkemer to a traffic stop.  See United States v. Morse, 569 F.3d 882 (8th Cir. 2009).  In that case, police stopped the vehicle in which Morse was a passenger.  Id. at 883. The driver was arrested for driving with a suspended license and the officer asked Morse to exit the vehicle so as to conduct a search of the vehicle incident to arrest.  Id.  When Morse exited, the officer told Morse he was going to conduct a pat-down search and asked Morse if he had anything on his person the officer should know about.  Id.  At that point, Morse told the officer he had crack cocaine in his pocket.  Id.  Morse later moved to suppress his statement and the fruits of the officer's search of his person because the interrogation by the officer was without benefit of Miranda warnings.  Id.

The district court granted the motion to suppress, declining to apply the holding of Berkemer because the district court held that "the questioning of [Morse] was not in connection to the reason for the stop and far exceeded a routine roadside questioning." Id. at 884.  The Eighth Circuit reversed, holding that Berkemer controlled the analysis.  Id. at 884-85.  The court held that,

under Berkemer, the mere fact that Morse did not feel free to leave was not determinative of whether Miranda warnings were required.  Id.  In addition, the court noted that Morse was asked only a "modest number of questions" and the facts did not establish a situation tantamount to a formal arrest.  Id.

This court, like the Morse court, finds the decision in Berkemer controlling.  Here, the questions asked of Mr. Porras-Palma that elicited the incriminating statement about his legal status in the United States were perhaps unrelated to the investigation of the accident, but the question followed immediately upon the heels of that accident investigation.  Furthermore, like the defendant in Morse, the number of questions Sheriff Koester asked was modest.

Finally, the court notes that Mr. Porras-Palma made no statements at all after he said that neither he nor his passenger were in this country legally.  It was only after this point that the situation became custodial in a way distinct from that contemplated by the routine traffic stop discussed in Berkemer.  Thus, during the time frame when the questions were asked that elicited the incriminating response, the situation was one of a routine traffic stop.  The questioning took place in public at a parking lot adjacent to a truck stop where, presumably, pedestrians and motorists were coming and going all the time.  Berkemer, 468 U.S. at 436-38, 440.  Mr. Porras-Palma was not physically restrained at any point prior to this question and the incriminating

response.  Thus, the analysis of <u>Berkemer</u> controls.  <u>Id.</u>  The court recommends that Mr. Porras-Palma's motion to suppress his statement to Sheriff Koester on the basis of <u>Miranda</u> be denied.

## 2. Whether Physical Evidence Should Be Suppressed

Even if the court were to find that Mr. Porras-Palma was in custody during the March 16, 2010, traffic stop and, thus, that <u>Miranda</u> warnings were required, this would not require suppression of the physical evidence discovered in the search of the vehicle Mr. Porras-Palma was driving.  Though the court has rejected Mr. Porras-Palma's argument regarding the necessity of <u>Miranda</u> warnings, for purposes of completing the record, the court will address whether the physical evidence obtained from his vehicle should be suppressed in the event a reviewing court determines that <u>Miranda</u> warnings were required under these circumstances.

In <u>United States v. Patane</u>, 542 U.S. 630, 633-34 (2004), the Supreme Court addressed whether physical evidence obtained as a result of a voluntary but unwarned statement should be suppressed as fruit of the poisonous tree because the statement was obtained in violation of <u>Miranda</u>.  Justices Thomas and Scalia and then-Chief Justice Rehnquist held that physical evidence does not fall within the Fifth Amendment's protection against self-incriminating statements and, therefore, physical evidence which is obtained pursuant to voluntary but unwarned statements need not be suppressed.  <u>Id.</u> (plurality).  Justices Kennedy and O'Connor concurred, stating that admission of physical

evidence does not "run the risk of admitting into trial an accused's coerced incriminating statements against himself." Id. at 645.

The Eighth Circuit has addressed the issue of the admissibility of physical evidence in the form of a suspect's fingerprints that were obtained through unwarned, voluntary statements. See United States v. Flores-Sandoval, 474 F.3d 1142, 1144 (8th Cir. 2007). The court held that so long as the non-Mirandized statement was voluntary, the Miranda violation does not warrant the suppression of derivative physical evidence. Flores-Sandoval, 474 F.3d at 1147.

In United States v. Phillips, 468 F.3d 1264 (10th Cir. 2006), cert. denied, 549 U.S. 1312 (2007), the Tenth Circuit held that DNA evidence obtained from a defendant without prior Miranda warnings need not be suppressed. Phillips, 468 F.3d at 1265-66. In Phillips, the police had obtained an unwarned statement from Phillips and used that statement in an affidavit seeking a search warrant for the purpose of obtaining a buccal swab from Phillips. Id. Phillips argued that the buccal swab evidence and the resulting DNA analysis conducted from that buccal swab should be suppressed because the search warrant was based in part on a statement obtained in violation of Miranda. Id. Because the statement itself, though unwarned, was voluntary and uncoerced, the Tenth Circuit held that the resulting physical evidence need not be suppressed. Id. (citing United States v. Patane, 542 U.S. at 635, 645 (plurality

opinion and Kennedy, J., concurring). The Tenth Circuit also held that the fact that <u>Patane</u> had involved an unwarned statement that led to the physical evidence, while this case involved an unwarned statement that was used in an affidavit for a search warrant that in turn led to the physical evidence, was a distinction without any legal significance. <u>Id.</u> Rather, the key fact was that the subject of the defendant's suppression motion in both cases was physical evidence rather than a statement.

In the <u>Morse</u> case, discussed *supra*, the Eighth Circuit held that the crack cocaine obtained from Morse after he made unwarned statements need not be suppressed. <u>Morse</u>, 569 F.3d at 884-85. The court held that, under <u>Patane</u>, a voluntary but unwarned statement was not grounds for the suppression of "physical evidence that is the fruit of custodial interrogation conducted without <u>Miranda</u> warnings." <u>Id.</u> <u>See also</u> <u>United States v. Syslo</u>, 303 F.3d 860, 865 (8th Cir. 2002) (<u>Miranda</u> warning not required before handwriting exemplars are obtained from suspect).

Applying the above precedent to the facts before the court, the court concludes that, even if Sheriff Koester was required to give Mr. Porras-Palma <u>Miranda</u> warnings at the traffic stop, the Fifth Amendment does not dictate that the physical evidence in this case be suppressed. No assertion is made by Mr. Porras-Palma that his statement was other than completely voluntary. The only argument made in favor of suppression is <u>Miranda</u>. The rule in <u>Miranda</u>

derives from the Fifth Amendment and the Fifth Amendment is concerned only with self-incrimination.  <u>Patane</u>, 542 U.S. at 633-34.  Since the Supreme Court has held that physical evidence does not implicate the Fifth Amendment prohibition against self-incrimination, <u>id.</u>, this court recommends that the physical evidence in this case not be suppressed based on Sheriff Koester's failure to give <u>Miranda</u> warnings.

**B.**    **Whether the Continued Detention of Mr. Porras-Palma Was Illegal**

The second prong of Mr. Porras-Palma's attempt to suppress the evidence in this case stems from the Fourth Amendment.  Mr. Porras-Palma argues that Sheriff Koester detained him for longer than was necessary for a typical accident investigation and, therefore, that his continued detention violated the Fourth Amendment.

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief."  <u>Brendlin v. California</u>, 551 U.S. 249, 255-56 (2007); <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979); <u>United States v. Wheat</u>, 278 F.3d 722, 726 (8th Cir. 2001).  A stop of the driver of a vehicle results in a seizure under the Fourth Amendment of all occupants of the vehicle.  <u>Brendlin</u>, 551 U.S. at 255-56.

A traffic stop is legal under the Fourth Amendment if it is supported by probable cause to believe that a violation of law has occurred.  <u>Whren v. United</u>

States, 517 U.S. 806, 810 (1996). "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. 'This is true even if a valid traffic stop is a pretext for other investigation.' " United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting United States v. Coney, 456 F.3d 850, 855-56 (8th Cir. 2006) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002)). A traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (quoting United States v. Chatman, 119 F.3d 1335, 1339-40 (8th Cir. 1997)). An officer's subjective motivations are irrelevant to the probable cause determination. Id.

A traffic stop under the Fourth Amendment can also be justified by a lesser showing of a "reasonable suspicion" pursuant to Terry v. Ohio, 392 U.S. 1 (1968). United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007). An officer making a Terry stop "must be able to articulate something more than an 'incohate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1, 7 (1989). The Fourth Amendment requires "some minimal level of objective justification" for making the stop. INS v. Delgado, 466 U.S. 210, 217 (1984). The Court has held that probable cause means " 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause." Sokolow, 490 U.S. at 7 (citing Illinois v. Gates, 462 U.S. 213,

238 (1983)). "Police must have a 'particularized and objective basis' for suspecting criminal activity at the time the stop is made." United States v. Spotts, 275 F.3d 714, 718 (8th Cir.2002).

"Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors–quantity and quality–are considered in the 'totality of the circumstances–the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion." Alabama v. White, 496 U.S. 325, 330 (1990) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial. Wong Sun v. United States, 371 U.S. 471, 484 (1963); United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001).

If the officer has an objectively reasonable belief that the suspect has violated traffic law, even if the officer is mistaken, reasonable suspicion for the stop can still exist. United States v. Bueno, 443 F.3d 1017, 1024-25 (8th Cir. 2006) (citing United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005)); United States v. Martin, 411 F.3d 998, 1000-02 (8th Cir. 2005).

After an initial stop, the resulting detention must be no longer than reasonably necessary and must be reasonably related to the circumstances which initially justified the stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005);

United States v. Sharpe, 470 U.S. 675, 685-87 (1985); Florida v. Royer, 460 U.S. 491, 500 (1983). There are no rigid time limitations on a Terry stop. Sharpe, 470 U.S. at 685; United States v. Watts, 7 F.3d 122, 125 (8th Cir. 1993). Rather, the court is to consider the purposes for which law enforcement stopped the vehicle as well as the time reasonably needed to effectuate those purposes. Sharpe, 470 U.S. at 685. The court must consider whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id. at 686. It is the government's burden to prove that a detention pursuant to reasonable suspicion was sufficiently limited in scope and duration. Royer, 460 U.S. at 500.

The Eighth Circuit has held that a "reasonable investigation of a traffic stop may include checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, and requesting the driver's destination and purpose. United States v. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2004) (citing United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002); United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994)); United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998)). See also Caballes, 543 U.S. at 407 (a seizure justified by the interest in issuing a ticket to the driver "can become unlawful if it is prolonged beyond the time reasonably

required to complete that mission."); United States v. Gallardo, 495 F.3d 982, 987 (8th Cir. 2007).

If an officer's permitted initial investigatory steps arouse reasonable suspicions, the officer is "entitled to expand the scope of the stop and ask questions not directly related to the initial traffic stop." Gomez Serena, 368 F.3d at 1040; see also Ramos, 42 F.3d at 1163 (traffic stop may not be expanded unless "objective circumstances supply the trooper with additional suspicion."). "An investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." Gomez Serena, 368 F.3d at 1041 (citing United States v. Long, 320 F.3d 795, 799-800 (8th Cir. 2003)).

If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial. Wong Sun v. United States, 371 U.S. 471, 484 (1963); Wheat, 278 F.3d at 726.

The facts of this case are similar to those in United States v. Donnelly, 475 F.3d 946 (8th Cir. 2007). In Donnelly, the defendant had sideswiped a semi-truck on a rural stretch of Interstate highway on a clear sunny late morning in summer. Id. at 950. A highway patrol officer who responded to the accident discovered from the truck driver that Donnelly had not wanted the

police to be called to the accident scene.  Id.  Further, the patrolman noted that Donnelly had bloodshot, glazed-over eyes, but emitted no smell of alcohol.  Id. Also, the patrolman noted that Donnelly was nervous in a manner different from that of a shaken-up accident victim.  Id.  When the patrolman inquired of Donnelly about his travel plans, Donnelly recited an itinerary that did not make sense to the officer.  Id.  Further, the patrolman thought Donnelly's attitude about certain aspects of his itinerary seemed inappropriate.  Id.

The officer then asked Donnelly as series of "drug interdiction" questions, and formed the opinion that Donnelly's answers to some of the questions were suspicious.  Id. at 951.  Accordingly, 12 minutes after arriving at the accident scene, the officer called for a drug dog to be brought to Donnelly's location.  Id. The dog arrived 59 minutes later, alerted to Donnelly's vehicle, and controlled substances were turned up in the subsequent search of that vehicle.  Id.

On appeal, Donnelly argued that the district court had erred in refusing to suppress the evidence seized after the search of his vehicle.  Id. at 951-53. Donnelly argued that the officer had unreasonably delayed his initial accident investigation, thus violating Donnelly's Fourth Amendment rights.  Id.  The court noted that even innocent facts, taken together, can give rise to reasonable suspicion justifying a police officer's further detention of a suspect in order to investigate.  Id. at 953.  Here, the fact that Donnelly had not wanted police called to the accident, and his answers to questions about his itinerary,

were sufficient to arouse the officer's suspicions sufficient to justify the drug dog sniff.  Id.  Also, the court held that, by calling in a drug dog a mere 12 minutes after the officer arrived at the scene, the investigating officer had acted with reasonable promptness.  Id.  Finally, the court held that the 59-minute delay while Donnelly awaited the arrival of the drug dog at the accident scene was not unreasonable, noting that the accident occurred in a rural area, there was no evidence that a drug dog could have reached the scene any earlier, and the court had previously approved delays of up to 90 minutes.  Id. at 953-54.

Here, the primary delay in Sheriff Koester's conclusion of his investigation of the Porras-Palma accident was the presence of another, unrelated accident that he had not yet investigated.  Sheriff Koester was in essence performing "triage" by assessing the necessity (or lack thereof) for immediate action in connection with Mr. Porras-Palma and the potential need for help by him at the second location.  This was not unreasonable under the circumstances.  Furthermore, the time delay was only 20 minutes, a time period the court finds to be reasonable given the rural nature of the location where Sheriff Koester was performing his twin accident investigations on March 16, 2010.  Once reunited with Mr. Porras-Palma, Sheriff Koester proceeded with all due diligence.

In investigating the accident, Sheriff Koester had reasonable suspicion to continue to detain Mr. Porras-Palma further after he was unable to produce a

driver's license or to produce any identification other than the Mexican identification card he handed to Sheriff Koester.  This, coupled with the fact that neither occupant of the pick-up would meet his gaze, and the fact that the pick-up was not registered to either Mr. Porras-Palma or his passenger, was sufficient to justify Sheriff Koester's asking of additional questions in an attempt to dispel his suspicions.

As the Supreme Court has noted, there is "no rigid time limitation on [investigative] stops."  <u>Sharpe</u>, 470 U.S. at 685.  Given that the touchstone of Fourth Amendment searches and seizures is "reasonableness," <u>Samson v. California</u>, 547 U.S. 843, 855 n.4 (2006), the court finds that Sheriff Koester's detention of Mr. Porras-Palma at this traffic stop was not unreasonable and, therefore, not in violation of the Fourth Amendment.  <u>Donnelly</u>, 475 F.3d at 950-54.  Accordingly, this court recommends denial of Mr. Porras-Palma's motion to suppress on the grounds that Sheriff Koester violated his Fourth Amendment rights.

## C.     Inevitable Discovery

Finally, having failed to cite the court to the <u>Berkemer</u>, <u>Patane</u>, or <u>Donnelly</u> decisions, the government urges the court to deny Mr. Porras-Palma's motion to suppress on the grounds of the inevitable discovery doctrine.  <u>See United States v. Alvarez-Gonzalez</u>, 319 F.3d 1070, 1072 (8th Cir. 2003).  The inevitable discovery doctrine applies where there is a reasonable probability

that police would have discovered the evidence in the absence of police misconduct while pursuing an alternative line of investigation.  Id.

The court rejects the government's entreaty to apply the inevitable discovery doctrine for two reasons.  First, resort to the inevitable discovery doctrine is unnecessary in this case since the evidence in this case was not obtained unconstitutionally.  Second, the court rejects this alternative holding because it is not supported by the facts.  Sheriff Koester testified that, in the ordinary course, a motorist who committed the offenses of driving without a valid license or overdriving road conditions would not have been arrested, the vehicle would not have been impounded, and, therefore, no inventory search would have been conducted.  The court rests its recommendation on the conclusion that Sheriff Koester did not violate Mr. Porras-Palma's constitutional rights rather than invoking inevitable discovery.

## CONCLUSION

The court respectfully recommends that Mr. Porras-Palma's motion to suppress [Docket No. 25] be denied in all respects.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely

and specific in order to require *de novo* review by the district court.  <u>See</u>

<u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th

Cir. 1986).

      Dated May 24, 2010.

                    BY THE COURT:

                    /s/ *Veronica L. Duffy*

                    VERONICA L. DUFFY
                    UNITED STATES MAGISTRATE JUDGE